POWELL MANUFACTURING COM-
PANY, Inc.
and
R. H. Bouligny, Inc., Plaintiffs,
v.
LONG MANUFACTURING COMPANY,
Defendant.

Civ. A. No. 876.

United States District Court,
E. D. North Carolina,
Wilson Division.

Oct. 29, 1970.

Raymond F. Lippitt, Washington, D. C., Sydnor Thompson, Charlotte, N. C., for plaintiffs.

A. Yates Dowell, Jr., Arlington, Va., Henry C. Bourne, Tarboro, N. C., for defendant.

## OPINION

WALTER E. HOFFMAN, District Judge.

The plaintiffs, Powell Manufacturing Company, Inc., and R. H. Bouligny, Inc., are the assignees of two patents which were granted to Dr. Francis J. Hassler. The patents include (1) Apparatus for Bulk Curing Tobacco, Patent No. 3,105,713, granted October 1, 1963, and (2) Method for Bulk Curing Tobacco, Patent No. 3,110,326, granted November 12, 1963. The plaintiffs claim that these patents are valid and that the defendant, Long Manufacturing Company, has infringed them.

### DR. HASSLER'S BACKGROUND AND HIS ORIGINS IN BULK CURING

The facts surrounding this action begin in September 1950 when Dr. Hassler, having just completed his Ph.D. degree at Michigan State University, accepted a position with North Carolina State College (now North Carolina State University) as assistant professor engaged in full-time research of tobacco. As part of the college's policy of allowing its professors to pursue a line of research of their own choosing, Dr. Hassler chose to undertake studies on the changes that took place in the tobacco leaf during the curing process with particular emphasis on the temperature, moisture content, and ventilation range throughout the curing cycle. Although his original experimentation involved working with individual leaves and the changes taking place therein, Dr. Hassler soon became interested in the behavior of tobacco when handled in bulk. In his first series of tests, he piled the tobacco leaves together. It was at this time that he found that the deterioration of the tobacco, which occurred through the rise in temperature due to the natural processes in the leaves, could be avoided by ventilating the pile and keeping the temperature below that at which damage occurred.[1]

### DR. HASSLER'S WORK— THE EARLY STAGES 1954–1957

After the 1954 harvesting season, Dr. Hassler started working on the equipment which could be used in carrying out bulk curing. This consisted of a horizontally positioned screen having a rectangular frame in the form of four walls extending upwardly therefrom. The tobacco leaves would be packed together, the leaves extending vertically upward with the butts down. The equipment included a blower, connected by ductwork to the bottom of the screen thus establishing a flow of air through the bed of packed leaves, and a fan which heated the forced air.[2]

In testing this equipment in 1955, Dr. Hassler found that bulk curing could not be accomplished without some improvement of the apparatus. The main problem which he had to solve was that as the leaves began to lose moisture during the "yellowing" (the first stage of tobacco curing) and "leaf-drying" (the second stage of tobacco curing), they became limp and started matting together, thereby preventing the free flow of air between them. To correct this, Dr. Hassler employed elongated rods which were pushed through openings in the walls of the curing chamber and through the tobacco to assist in supporting the leaves during the curing operation.

In 1956, Dr. Hassler continued his experimentation in curing under varied conditions and comparing the results of conventionally cured tobacco with bulk-cured tobacco (shredded and intact). One of the significantly different features about the bulk curing tests was that a longer "yellowing" time was required. As a result of the 1956 tests, Dr.

---

1. This aspect of Dr. Hassler's research was described in a thesis called "Yellowing Flue-cured Tobacco in Bulk" printed in Tobacco Science, vol. II, pp. 23–28, March 14, 1958. (D.Ex. 8)

2. This is diagramed in D.Ex. 21R. Figure 2 shows how this is done with the leaves intact and figure 3 shows the apparatus with shredded leaves.

Hassler found that although the chemical properties of both conventional and bulk-cured tobacco were about the same, the physical properties of bulk-cured tobacco were not so satisfactory as conventionally cured tobacco, and thus he decided to spend the 1957 season in establishing a temperature and drying schedule with a ventilation rate that would produce acceptable tobacco.

Dr. Hassler's work during 1957 is summed up in a report compiled by him and his associates entitled "Developments in Bulk-Curing of Bright Leaf Tobacco." [3] As far as the apparatus for the bulk-curing tests were concerned, it is significant to note that the equipment used in 1957 was the same basic equipment which was later patented, with only minor modification in design or changes in dimension. The equipment used consisted of a curing cabinet,[4] including a rectangular curing chamber,[5] the walls of which were provided with rails for receiving intact bulk tobacco racks or sheet metal baskets for shredded leaf tobacco. The cabinets also included a blower and heater with suitable controls and steam supply lines for controlling the relative humidity of the curing air. The intact bulk leaf racks [6] consisted of two racks which would fill the curing chamber when placed side to side. A significant feature of the racks was that each rack had a plurality of parallel elongated spikes extending outwardly from a two-by-four member, and were loaded with intact leaves.[7] The loading form consisted of a base section having a slot to receive the first section of the rack therein, with the end member at each end extending upwardly. Mounted on the base section was a top section of generally U-shaped configuration providing a back wall and two end walls extending above the base section when the top section was mounted thereon. The side walls of the top section were formed with vertical slots for receiving upwardly extending end members of the first rack section. In order to load the racks, the intact tobacco leaves were placed within the loading form and the first rack section was disposed in the slots until the entire loading form was filled to a predetermined extent. After the loading form had been filled, the second rack section, with the free ends of the prongs thereof facing downwardly, was moved rectilinearly downward through the bulk batch of leaves within the loading form; the ends of the frame member of the second rack section passing through the slots in the side walls of the loading form into cooperating relation with the end members disposed therein.[8]

During this movement of the pronged rack section through the leaves, the entire mass of the leaves assembled in the loading bin was compressed. The end members were then secured to the ends of the pronged rack section by nuts to retain the rack section together. With the rack sections thus filled with tobacco and secured together, the top section of the loading form was then removed,[9] to allow the filled rack to be moved [10] into supporting relation to the rails within the curing chamber of the curing cabinet. After the racks were loaded in this fashion, both being of uniform leaf density by virtue of the initial filling of the leaves in the loading form, and then supported within the curing chamber of the curing cabinet in side-by-side relation, the tobacco was ready for curing.[11]

Curing conditions during the 1957 tests are summed up also in the above-mentioned report.[12] It is interesting to note the graph giving a comparison of intact bulk and conventional curing with respect to the temperature-time relationship. Although the "yellowing" time in

3. D.Ex. 23 (printed January 1959).

4. D.Ex. 23, fig. 2.

5. D.Ex. 23, fig. 3.

6. D.Ex. 23, fig. 6.

7. D.Ex. 23, fig. 5.

8. D.Ex. 23, fig. 11.

9. D.Ex. 23, fig. 12.

10. D.Ex. 23, fig. 13.

11. D.Ex. 23, figs. 14, 17.

12. D.Ex. 23, pp. 29–31.

bulk curing was a little longer than conventional, the drying time was less. It is evident here that the overall curing periods did not differ very much as to time, and even less as to temperature.[13]

Up to this point in time, Dr. Hassler had been conducting bulk-curing tests with both shredded and intact leaves. As to the shredded leaves, he found that the results did not produce a satisfactorily cured product. There was no improvement in 1958, and he decided to limit his experiments to intact bulk leaf curing which he did consider to have possibilities.

## THE PILOT-PLANT TESTS OF 1958

At this point, Dr. Hassler began a new phase of his bulk-curing experimentation—the 1958 Pilot Plant Research which was described in the "1958 Annual Research Report of Curing and Grading of Bright-Leaf Tobacco."[14] As has already been indicated, the equipment used in these tests was very similar to that of 1957, and there were only minor changes. The curing chamber was larger as it was constructed in one end of a large compartment barn and the dimensions of the rack were larger to fit within the larger curing chamber; instead of humidity in the forced air flow being controlled by a steam line supply, a damper system was used; and the direction of movement of curing air through the tobacco leaves was upwardly instead of downwardly.

As far as the bulk-curing method is concerned, it again appears that, at least as far as the temperature-time relationship was concerned, there was no significant difference.[15]

At the end of the 1958 experiments, Dr. Hassler concluded that there was "a high probability that bulk curing leaf will become acceptable to the trade." He stated, however, that "[B]efore appropriate curing systems can be developed for farm application, there yet remains farm-scale testing."[16]

Being satisfied with the results of the process and equipment at the end of the 1958 curing season, Dr. Hassler made only minor changes the next year. The most significant of these was an unsuccessful attempt to place the curing racks in three tiers, rather than two tiers, during the 1959 season. From this point on, it was Dr. Hassler's paramount concern to seek commercial acceptance of bulk curing and obtain the interest of some company which was willing to risk substantial capital in the development of equipment for bulk curing.

## THE PLAINTIFFS ENTER THE PICTURE

Pursuant to Dr. Hassler's desire for commercial acceptance of his bulk-curing ideas, Allegheny Building Units, Inc., which specialized in construction of sheet metal buildings, investigated the possibility of entering the business of making sheet metal curing barns. They contacted Dr. Hassler, who had just obtained a commitment to have his process farm tested on a farm in Robeson County, North Carolina, for the 1960 harvest season. On the basis of information received from Dr. Hassler, Allegheny offered to furnish the necessary funds to build equipment for farm-scale testing of bulk curing. In exchange for this financial risk, Dr. Hassler assigned all patent rights he had toward the process and equipment to Allegheny.

13. D.Ex. 23, fig. 20, at p. 30. Also note the thesis by Wightman W. Garner entitled, "The Production of Tobacco," (1951), D.Ex. 9, p. 174 et seq. Plaintiff's proposed findings of fact, pp. 15–16, also bear out this finding.

14. D.Ex. 24.

15. D.Ex. 24, pp. 26, 36.

16. D.Ex. 23, p. 55B. This is a statement by Dr. Hassler and his associates in a paper entitled "Progress in the Development of Bulk Curing of Bright Leaf Tobacco," D.Ex. 23, pp. 55A–55B. Supported also by plaintiff's proposed findings of fact, p. 18.

The 1960 tests created a great deal of interest [16a] and the plaintiffs felt that the tests were a success. In the ensuing months Allegheny changed its name to Alkon Industries, Inc., and undertook the commercial production and sale of bulk curing barns, similar to the barn used in the 1960 farm-scale tests, and racks of an improved all-metal construction. Alkon Industries then sold its bulk-curing equipment business to R. H. Bouligny, Inc., in 1962 which, in turn, transferred an interest in the patents to its subsidiary, Powell Manufacturing Company, Inc.

## HOW DR. HASSLER OBTAINED PATENT RIGHTS

It is important at this point to retrace some time chronologically and detail the facts behind Dr. Hassler's acquisition of the patent rights for the bulk-curing equipment and method. As indicated above, Dr. Hassler started work on this subject while employed by North Carolina State College. In accordance with the patent policy of that educational institution [16b] Dr. Hassler referred his ideas to the Faculty Patent Committee. In turn, they submitted the information to Research Corporation, an independent, nonprofit organization engaged in patenting and licensing services for a number of colleges and universities throughout the country.

The first piece of information submitted in accord with this policy was on August 23, 1955, when W. D. Colwell, Assistant Director in Charge of Tobacco Research, submitted a disclosure entitled "Pile Curing" to J. G. Vann, the Chairman of the Patent Committee. This information was then sent to Research Corporation which researched the possibilities of patenting the process disclosed. On October 13, 1955, Research reported that, based on their patentability investigation, they felt that the invention was anticipated by the prior art and, therefore, they did not recommend filing a patent application.[17]

The cited patents [18] together with the report were transmitted to Dr. Hassler, and as a result of studying the disclosure of the patents, he felt that they did *not* anticipate his work. In order to pursue this, Dr. Hassler obtained authorization to engage in direct correspondence with Research. On Dr. Hassler's behalf, G. W. Giles, Head of the Department of Agricultural Engineering, wrote Research explaining Hassler's arguments for patentability for pile curing of flue-cured tobacco. In reply, Research wrote Professor Giles on January 13, 1956, and stated that, after reconsideration, Research still could not recommend filing a patent application on the pile curing process. He said that although the patent office may allow limited claims on the process, Research felt that they would be so restricted as to be ineffectual for licensing purposes.

Dr. Hassler, still dissatisfied with Research Corporation's reply, arranged with S. Blake Yates, the assistant director of the patent development division of Research, for him to visit Hassler in May 1956.[19] During their conference at that time, Dr. Hassler showed Yates the equipment to be used during the 1956 research activities [20] and described to him the procedures for using the equipment. Later he sent Yates a disclosure of some of the details of his

---

16a. It was estimated that about 10,000 people visited the Stone Brothers farm in Lumberton, Robeson County, N. C., to see these tests. One of the visitors was John Long, president of the defendant company.

16b. D.Ex. 20.

17. D.Ex. 21B–21G.

18. Three patents were cited:
 a. Coffee — # 320,459
 b. Smith — # 1,952,781
 c. Viglione — # 2,708,441

19. D.Ex. 21N–21P.

20. D.Ex. 21R.

ideas.[21] Again, however, Yates recommended against filing a patent application and, in a letter to Dr. Hassler,[22] Yates said that—

"We have no reason to doubt that this method has real and demonstrable advantages over conventional curing methods and that it will be readily accepted by the tobacco industry but we feel strongly that any patent claims that might be allowed by the Patent Office would be extremely narrow and limited to noncritical steps * * *

"It would be our suggestion that you make your discovery available to the tobacco industry by publishing your work in an appropriate journal. If this procedure is followed, I feel that I can assure you that no outsider can obtain patents that would deprive the industry of the free use and benefits of your discovery."

In response, Dr. Hassler wrote the Research Corporation a letter dated August 15, 1956,[23] in which he stated:

"We appreciate your immediate evaluation of our bulk-curing method as it relates to patent possibilities. We are content at this time to accept your evaluation for we realize your vast experience in such matters."

After the third unfavorable report by Research Corporation, no further action was taken by the Faculty Patent Committee, and in accordance with the patent procedures, the alleged invention was turned back to Dr. Hassler to do with as he pleased.[24] Hassler then continued with his work until Allegheny entered the picture in 1959, and, in return for Hassler's patent rights, Allegheny risked its capital in undertaking the building of farm-scale equipment.

## PUBLICATION OF DR. HASSLER'S WORK

During the years of 1956–1960, Dr. Hassler's efforts and experiments received a great deal of publicity in several magazines, newspapers, and other assorted articles.[25] Among the most im-

---

21. D.Ex. 21R.

22. D.Ex. 21S.

23. D.Ex. 21T.

24. D.Ex. 21A, p. 6.

25. These are detailed on pp. 4, 5 of D. Ex. 21A. They include:

| | |
|---|---|
| November 12, 1956 | — "Tobacco Cured Without Sticks in Oxford Tests"—Raleigh News & Observer (D. Ex. 12) |
| Spring, 1957 | — "Barnless Curing"—Research and Farming, vol. XV, no. 4 (D. Ex. 7) |
| July, 1957 | — "Will Bulk-Curing Replace Flue-Curing" —Progressive Farmer (D. Ex. 14) |
| March 14, 1958 | — "Yellowing Flue-Cured Tobacco in the Bulk"—Tobacco Science section of Tobacco (D. Ex. 8) |
| November 10, 1958 | — "Bulk Leaf Curing Method Ready for Farm Testing"—Raleigh News & Observer (D. Ex. 4A) |
| November 19, 1958 | — "Bulk Curing Tobacco Process Ready for Field Tests"—The Daily Reflector, Greenville, N. C. (D. Ex. 6) |
| June, 1959 | — "Bulk Curing Simplifies Tobacco Mechanization"—Presentation to American Society of Agricultural Engineers, Ithaca, N. Y. Published in journal "Agricultural Engineering", August, 1960. |
| October 1959 | — "Tobacco Research Gears for Challenge." Nation's Agriculture published by American Farm Bureau Federation. (D. Ex. 15) |

portant of these is the article entitled "Bulk Leaf Curing Method Ready for Farm Testing," which appeared in the Raleigh *News & Observer*, November 10, 1958. This article has a great deal of bearing on this case, particularly with respect to the validity of the apparatus patent in light of 35 U.S.C., section 102 (b).

## POSSIBILITY OF DEDICATION

Although Dr. Hassler asserts that he never intended to dedicate the patent rights to the public,[26] there is some evidence to the contrary emanating from the facts. Defendant's exhibit 21A entitled "Statement Relative to Handling of Patent Matters and the Commercial Development of Bulk Curing" was prepared by Dr. Giles, with Dr. Hassler's knowledge and approval, and among other information the following statement was included:

"In accordance with the recommendation of Research Corporation, the results were published so that discovery would be available to the tobacco industry." [27]

Also included in the same exhibit is the statement:

"In accordance with the recommendation of Research Corporation, action was taken to inform the public and in-

dustries * * * about the results by every available media."

It appears that this "Statement" (D. Ex. 21A) was prompted by the trustees of North Carolina State who had received complaints from farmers because they had not been able to get a set of plans for on-the-farm construction of bulk curing facilities and had been told by the Attorney General of North Carolina that the sale of any product from the facility would be a patent infringement.

## INFRINGEMENT

We deem it unnecessary to discuss the issue of infringement as such presupposes a valid patent. We can only state that if the patents, or either of them, are valid, there would be obvious indications of infringement.

## STATUTORY LAW AND ISSUES

We are concerned with the interpretation of 35 U.S.C., section 102(b) and 35 U.S.C., section 103. Section 102 provides in part:

"A person shall be entitled to a patent unless—

(b) the invention was patented or described in a printed publication in this or a foreign country or in

| Summer, 1959 | — | "New Step in Mechanization—Bulk Curing of Tobacco"—Research and Farming, vol. XVIII: no. 1 (D. Ex. 11) |
| December, 1959 | — | "Bright Leaf Can be Cured in Bulk"—Agricultural Research U.S.D.A. (D. Ex. 13) |

Several articles were also written by Dr. Hassler and his associates which were summaries of their work as they progressed with same. These are included in defendant's exhibits 21–25.

 D. Ex. 21—"Statement Relative to Handling of Patent Matters and the Commercial Development of Bulk Curing"

 D. Ex. 22—1956 Annual Research Report (March 1957)

 D. Ex. 23—1957 Annual Research Report (January 1959)

 D. Ex. 24—1958 Annual Research Report (May 1960)

 D. Ex. 25—1959 Annual Research Report (June 1960)

26. Plaintiff's Proposed Findings of Fact, pp. 50–51; Trial Record, p. 214.

27. D.Ex. 21A, p. 4. See also, Trial Record, pp. 207–208.

public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * * "

The conditions for patentability relating to nonobvious subject matter are set forth in 35 U.S.C., section 103, as follows.

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the difference between the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

The facts recited herein and the statutory law quoted above lead us to the issues hereinafter stated—

(1) Were the inventions in question fully and clearly described in a printed publication more than one year prior to the date of the application for patent in the United States?

(2) Were the inventions in question in public use more than one year prior to the date of the application for the patent in the United States?

(3) Were the inventions in question on sale in the United States more than one year prior to the date of the application for patent?

(4) If the inventions in question were not fully and clearly described in a printed publication, were the differences between the subject matter patented and the prior art such that the subject matter as a whole would have been obvious at

the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains?

(5) Were the inventions dedicated to the public by Dr. Hassler so as to invalidate the patents?

### BURDEN OF PROOF

 Once a patent has been duly granted, as in the present case as to both the apparatus and the method, it is held to be *"prima facie* evidence that the patentee is the original and first inventor of that which is therein described, and secured to him as his invention." [28] Furthermore, there is a strong presumption of validity of a regularly issued patent.[29] These presumptions, however, are not conclusive and may be rebutted by the one attacking the validity of the patent by clear and convincing evidence.[30] Thus, in this case, for the defendant to prevail, it will have to carry this burden to overcome the validity of the patents in question.

### METHOD OF ANALYSIS

 In dealing with the prior publication and prior art rules, the first thing that must be done is to determine exactly what the invention is. Under 35 U.S.C., section 112, it is stated that the specifications of a patent must conclude with a claim. And it is the claim of the patent that measures the invention.[31] Thus, in this case, the claims [32] should be closely compared with the prior publication or art to see if they fall within section 102 or 103.

### TIME CUT-OFF UNDER SECTION 102(b)

Since the apparatus (bulk curing rack) patent was applied for on June 13, 1960,

28. Seymour v. Osborne, 11 Wall. 516, 538, 78 U.S. 516, 538. 20 L.Ed. 33 (1870).

29. Custom Undergarment Corp. v. R. H. Macy & Co., 140 F.2d 197 (2 Cir., 1944).

30. Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937); See 69 C.J.S. Patents § 145.

31. Bros Incorporated v. W. E. Grace Manufacturing Company, 351 F.2d 208 (5 Cir., 1965); Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908).

32. Claims are set out in P.Ex. 70.

the effective cut-off date for the prior publication, public use, or sale of the invention will be June 13, 1959.

## WERE THE INVENTIONS IN QUESTION FULLY AND CLEARLY DESCRIBED IN A PRINTED PUBLICATION PRIOR TO JUNE 13, 1959, SO AS TO INVALIDATE THEM UNDER 35 U.S.C., SECTION 102(b)?

The old case of Seymour v. Osborne, 11 Wall. 516, 78 U.S. 516, 20 L.Ed. 33 (1870), established the test of patent validity in light of prior publications.[33] In *Seymour*, Mr. Justice Clifford said:

"Patented inventions cannot be superceded by the mere introduction of a foreign publication of the kind, though of prior date, unless the description and drawings contain and exhibit a substantial representation of the patented improvement, in such full, clear, and exact terms as to enable any person skilled in the art or science to which it appertains to make, construct, and practice the invention to the same practical extent as they would be enabled to do if the information was derived from a prior patent. Mere vague and general representations will not support such a defense, as the knowledge supposed to be derived from the publication must be sufficient to enable those skilled in the art or science to understand the nature and operation of the invention, and to carry it into practical use. Whatever may be the particular circumstances under which the publication takes place, the account published, to be of any effect to support such a defense, must be an ac-

count of a complete and operative invention capable of being put into practical operation." [34]

In *Seymour*, the court upheld the validity of the patents and the plaintiff's claim that the defendants had infringed mainly on the basis of three witnesses who testified that the drawings in the magazine did not reveal what was in the plaintiff's patent and did not suggest the idea of this invention.[35]

In a recent case [36] involving the prior publication rule of 35 U.S.C., section 102(b) and the validity of a patent for a pneumatic roller, the Fifth Circuit adopted the *Seymour* test. The court upheld the validity of the patent since they thought that the brochure in question was not a full and complete disclosure of the invention. It is significant to note that the court's approach to the problem there was to carefully examine each claim and compare it with what was revealed in the brochure, and in their analysis the court said:

"The problem of identity of invention does not depend on a disclosure of body dimensions, tire sizes, or the like, none of which is specified in the claims. Identity, rather, depends on whether or not the brochure discloses structural features and characteristics that are precisely defined in the claims." [37]

Applying the *Seymour* and *Bros* tests to the case at hand, it seems clear that, at least as to the bulk curing rack, 35 U.S.C., section 102(b), will preclude its validity. As stated earlier in the summary of facts, the article in the Raleigh *News & Observer*, November 10, 1958, entitled "Bulk Leaf Curing Method

---

33. Seymour v. Osborne, 11 Wall. 516, 78 U.S. 516, 20 L.Ed. 33 (1870). Although Seymour dealt with a foreign publication, 35 U.S.C., section 102(b) makes no distinction. Also, the recent case of Bros Incorporated v. W. E. Grace Manufacturing Company, 351 F.2d 208 (5 Cir., 1965) dealt with a domestic publication and adopted the Seymour test. The Seymour rule was adopted by the United States Court of Appeals for the Fourth Circuit in Maibohm v. RCA Victor Co., 89 F.2d 317 (4 Cir., 1937).

34. Seymour v. Osborne, 11 Wall. 516, 78 U.S. 516, 535, 20 L.Ed. 33 (1870).

35. Id. at 532, 554.

36. Bros Incorporated v. W. E. Grace Manufacturing Co., 351 F.2d 208 (5 Cir., 1965).

37. Id. at 215.

Ready for Farm Testing" [38] is the main publication relied on by the defendant to invalidate the patent under 35 U.S.C., section 102(b). Comparing each particular of the plaintiffs' claim as to the bulk curing rack, it is abundantly clear that the defendant should be sustained on this point. The plaintiffs' claims are set out in plaintiffs' exhibit no. 70, and the newspaper article is defendant's exhibit no. 4–A. Perhaps the following analysis will be necessary to get the point across as to the similarity in the two.

### RALEIGH NEWS & OBSERVER NOVEMBER 10, 1958

Tobacco leaves compressed in bulk are described pictorially in all three pictures plus the diagram. The pictures show the loading rack, the frame with loaded compressed tobacco, and the placement of the frame in the barn with other frames. The diagram also shows, among other things, the flow of forced air vertically through the mass. The photo captioned "Interior of Barn" also describes the hot air moving upward.

One of the pictures is captioned "Bill Johnson places tobacco into frames for curing. Spikes at top of frame are pushed through tobacco to hold it in place." The picture itself shows the tobacco leaves being piled loosely in the loading frame. The flat surface of the leaves are all facing in the same direction. Although only one rack section is shown (the one with the spikes attached) it is obvious enough that what happens when the spikes are pushed through the leaves is that the spiked rack is attached to the other rack. This is made evident by the next picture captioned "Wiley Henson (left) and Rupert Watkins move a frame of tobacco from loading rack to curing barn. Frame holds 10–12 sticks." A close look at this picture reveals

### CLAIM OF THE HASSLER BULK CURING RACK—PATENT NO. 3,105,713

"A rack for supporting a batch of tobacco leaves in compressed bulk form within a curing barn for passage of a flow of forced air vertically therethrough comprising

"1. A pair of separable rack sections disposed in spaced relation with respect to each other in a loading position with a batch of tobacco leaves in loose bulk form, having the flat surface thereof disposed generally in the. same direction positioned therebetween,

---

38. D.Ex. 4–A—A newspaper description has been held to be an example of a printed publication under this statute. Gearon v. United States, 121 F.Supp. 652 (U.S.Ct.Claims, 1954). Note that the Raleigh *News & Observer* article was published before June 13, 1959.

the bolts at the end of the rack where the two are attached. Furthermore, it is evident that the men are holding a rectangular frame loaded with tobacco, which here could only be derived from attaching the pair of rack sections.

The photograph that begins "Bill Johnson * * *" clearly shows the plurality of thin and elongated spikes which are fixed to one of the rack sections. The spikes are in parallel relation to one another. The caption describes the spikes being pushed through the leaves which have been packed in loose bulk in the loading frame. The spikes move through the leaves perpendicularly and in the picture captioned "Wiley Henson * * *" the resulting compressed batch of leaves is shown.

Although it is not excessively clear from the newspaper picture, the bolts at the ends which hold the two frames together can still be seen. (Of course this is very clear in the original photo captioned "Wiley Henson * * *" —D. Ex. 4C) Furthermore, as discussed earlier, it is evident that there are two frames which are held together and it takes little imagination to determine that this would be done in this way. The photo captioned "Bill Johnson * * *" speaks of "frames" in the plural. And the photo captioned "Wiley Henson * * *" shows the two men holding the frame as put together (frame in singular) and so it is apparent the frames are put together to form one frame.

"2. A plurality of thin elongated spikes fixedly secured at one of their ends to one of said rack sections in generally parallel relation and extending in a direction toward the other of said rack sections being movable with respect to each other from said loading position rectilinearly toward each other in the direction of extent of said spikes into an operatively engaged position to pierce the free ends of said spikes into the leaves in a direction perpendicular to at least a substantial portion of the flat surfaces thereof and to compress the batch of leaves in loose bulk form into a relatively compact batch on said spikes and

"3. means carried by said rack sections adjacent each of the end portions thereof engageable to fixedly secure said rack sections against movement out of said operatively engaged position after the rectilinear movement of said rack sections into said operatively engaged position and disengageable to permit movement of said rack sections out of said operatively engaged position,

The photo captioned "Wiley Henson * * *" showing the two men holding the loaded frame at both ends evidences a rectangular structure. As said before, it is clear that the two rack sections have been connected after the spikes have loaded and compressed the leaves in the loading rack. The one side of the loaded rack in the photo captioned "Wiley Henson * * *," plus the way the men are holding it, shows at least three sides to the structure. The lowest photo on the page captioned "Interior of Barn * * *" is further evidence of the rectangular shape of the frames.

The supporting surfaces of the racks are shown in the three pictures captioned "Bill Johnson * * *," "Wiley Henson * * *," and "Interior of Barn * * *" It is obvious from the picture captioned "Bill Johnson * * *" that one of these is the one with the spikes attached. The other is the one to which the first one attaches thereto. These are then mounted on racks in the curing barn as shown in the diagram entitled "Experimental Model of Bulk Curing Chamber" and the picture captioned "Interior of Barn." The latter also describes the hot air and the former (the diagram) describes the hot air moving upwardly through the leaves.

The positioning of the racks described in this claim is fully described pictorially in the photo captioned "Interior of Barn" and graphically in the diagram entitled "Experimental Model of Bulk Curing Chamber."

"4. said rack with said rack sections in operatively engaged position providing a rectangular structure defining a continuous inwardly facing peripheral surface means for exteriorly peripherally supporting the batch of compressed leaves

"5. spaced supporting surfaces on one pair of opposite sides thereof facing in a direction perpendicular to the direction of extent of said spikes for engagement with cooperating oppositely facing supporting surfaces in the curing barn to mount the rack in operatively engaged curing position within the curing barn for passage of the flow of forced air vertically through the batch of leaves supported therein with their flat surfaces extending generally in the direction of the forced air flow, and

"6. exterior outwardly facing surfaces extending along the other pair of opposite sides thereof each being of a configuration to engage a corresponding opposite exterior surface of a similar rack in operatively abutting relation along the entire length of the respective exterior outwardly facing surfaces so as to effectively

prevent the passage of air therebetween. When such racks are disposed in operatively engaged curing position in side-by-side abutting relation.

It is clear from the photo captioned "Bill Johnson * * *" that the spikes are in parallel position and that they are spaced relative to each other a distance which is much greater than their thickness but much less than their length.

It is evident from the "Bill Johnson" photo that when the rack is loaded the spikes are driven through the leaves in a vertical position to the ground. After loading, the rack is operatively engaged and turned 90° so that it is horizontal to the ground as shown in the photo "Wiley Henson."

It is also obvious that by virtue of being driven through the tobacco while loading the rack, the spikes provide an interior support.

"7. said spikes when said rack sections are disposed in said operatively engaged curing position extending generally horizontally substantially throughout the space within which the batch of leaves is peripherally confined by said continuous peripheral surface means and being spaced apart relative to each other a distance substantially greater than their thickness and substantially less than their length so as to provide adequate interior support for the batch of leaves without materially restricting the flow of forced air vertically through the batch of leaves."

---

From this comparison of the claims made by Dr. Hassler in his bulk curing rack patent with the Raleigh *News and Observer* article, it seems clear that the patent is invalid. Not only is the basic concept of the apparatus revealed in the paper, which under some authority would invalidate the patent without more,[39] but also almost every detail of the claim is revealed in the newspaper.

It is significant to note at this point that in declaring the plaintiff's patent on the bulk curing rack invalid under the

prior publication rule of section 102(b), the decision rests on the narrow grounds of the statute. Assuming arguendo that the decision is weak on these grounds, which we do not believe from the conclusive effect of the comparison made, the same result could be sustained when 35 U.S.C., section 103, is invoked which takes into account both prior publication and prior art. When Dr. Hassler sought to have both the method and apparatus patent, with a few additions in the claims, patented together,[40] he was required to divide his claims. In deciding

39. In re Wenzel, 88 F.2d 501, 503, 24 C. C.P.A. 1050 (1937) ; In re Pappas, 214 F.2d 172, 177, 41 C.C.P.A. 989 (1954).

40. Method and Apparatus for Bulk Curing, D.Ex. 3A, Patent Application No. 35,499.

that the apparatus patent was invalid, the majority opinion of the United States Court of Customs and Patent Appeals held that the newspaper article, together with the prior art, precluded the right to patent.[41] In reaching this decision, the court examined the elements of the claims made by Dr. Hassler in light of what was presented in the newspaper article just as we have done. The court then discussed in detail the four points which the Board had considered as invalidated by the prior art, (1) on the basis of Stevens' patent [42] the humidifier was deemed obvious in conjunction with the tobacco curing apparatus claimed; (2) the dampers which were claimed by Hassler did not have to be considered part of the prior art since they were revealed in the *News and Observer* article; (3) the feature of the apparatus that showed doors to the curing chamber, although not shown in the *News and Observer*, were considered obvious and inherent as part of the structure; (4) finally, on the basis of Vickers' patent [43] of stick curing, the court held that the only difference between what was claimed and the Vickers patent was one of capacity and this was sufficiently disclosed in the *News and Observer*.[44] In concluding that the Board did not err in denying the patent, the court said:

"In view of the knowledge which one of ordinary skill in this art possesses, as evidenced by the patents to Vickers and Stevens, et al, The News and Observer article would make the subject matter presently claimed entirely obvious. Since the claimed invention has been obvious to the public for more

than a year prior to the appellant's filing date, we hold appellant to have lost his right under 35 U.S.C., § 102 (b)." [45]

Judge Smith, in a concurring opinion, felt that the claim could be dismissed simply on the basis of the prior publication and there was no need to refer to the prior art. He said:

" * * * the Raleigh News and Observer * * * so described the invention here claimed that one of ordinary skill in the tobacco flue-curing art can be said to have had possession of the invention at that time. The additional references cited are at best evidence of what one of ordinary skill in this art would be expected to know.[46]

Thus, although the apparatus patent (bulk curing rack) can be invalidated under the narrow grounds of 35 U.S.C., section 102(b) alone, if more is required the broader grounds of prior publication along with prior art can sustain the same result under 35 U.S.C., section 103.

It may be important to include as a side note a refutation to the plaintiffs' argument that the *News and Observer* article did not sufficiently disclose the rack patent. The plaintiffs' first contend that the rack was not completely disclosed in that the rods which hold the separable rack sections together are not shown.[47] In fact, plaintiffs are correct. However, the photo captioned "Wiley Henson" shows two men holding the assembled rack, one at each end. The picture also shows, although not with distinct clarity, but clear enough to see it, the end bolts which are used to connect the rods.[48]

41. In re Hassler, 347 F.2d 911, 52 C.C. P.A.1546 (1965).

42. Stevens et al., 2,752,096. June 26, 1956. D.Ex. 17F.

43. Vickers, 2,808,283. October 1. 1957. D. Ex. 17H.

44. This is clearly shown in the diagram entitled "Experimental Model of Bulk Curing Chambers" and the photo captioned "Interior of Barn."

45. In re Hassler, 347 F.2d 911, 919, 52 C.C.P.A. 1546 (1965). Note that only

section 102(b) was mentioned in the final analysis and not section 103.

46. Id., at 919.

47. Plaintiffs' Main Brief After Trial, p. 111.

48. Of course this is very clearly revealed in the glossy photo (D.Ex. 4C) which plaintiffs admit and also allege that this was what Mr. Long had in mind when he gave his testimony. But the fact is that these can be seen in the *News and Observer*.

Common sense will tell us that the men are holding something which must be the end edges of the assembled rack. Thus, it is fair to say that the men are holding onto something which connects one side with the other.

Using the same method of analysis as used in the examination of the apparatus patent, it is clear that 35 U.S.C., section 102(b) on the point of prior publication, will not by itself invalidate the Method Patent of Bulk Curing. It is equally clear, however, that when the prior publication rule under section 102(b) is combined with the prior art rule of section 103, the Method Patent must also fall. An in-depth description of the claims of the patent [49] as compared with the *News and Observer* article [50] (prior publication) and the book entitled "The Production of Tobacco" by Dr. Wightman W. Garner [51] will demonstrate the invalidity of the method patent under the above statutes.

| NEWS & OBSERVER ARTICLE AND GARNER BOOK COMBINED | CLAIM OF THE HASSLER BULK CURING METHOD— PATENT NO. 3,110,326 |
|---|---|
| | "A method of curing green tobacco leaves which comprises the steps of— |
| In the *News and Observer* article the photo captioned "Bill Johnson" shows Johnson loading the loading frame with tobacco. The flat surfaces of the tobacco leaves are horizontal and all of them are extending generally in the same direction with the points (tops) of the leaves extending out. (The other two photos and the diagram also show this general arrangement of the leaves once they have been compressed in the frame and set in the curing chamber.) The assembling of the leaves in the loading rack is also described verbally in the text of the article. | "1. assembling a multiplicity of green tobacco leaves together into loose bulk form with the flat surfaces thereof extending generally in the same direction and a substantial portion of the flat surfaces in a parallel relation, |
| The photo captioned "Wiley Henson" shows the tobacco leaves compacted in a peripherally confined (in the rack) bundle as a result of the loading and compressing shown in the photo captioned "Bill Johnson." | "2. compacting and peripherally confining the assembled leaves into a compact bulk bundle, |
| The photo captioned "Bill Johnson places tobacco in frames for curing. Spikes at top of frame are pushed through tobacco to hold it | "3. providing interior support within the peripheral confinement at spaced positions through substantially all of the leaves of |

49. P.Ex. 70.

50. D.Ex. 4A.

51. D.Ex. 9. This book was written by Dr. Garner in 1951 and includes a complete survey on the art of tobacco curing.

in place," describes the interior support aspect here. (The result is seen in the next photo, captioned "Wiley Henson," for a single rack loaded and the next photo, captioned "Interior of Barn," for the several racks placed in the barn. This is also seen in the diagram at the top of the page.)

The *News and Observer* once again very clearly shows what is claimed here. In the photo captioned "Wiley Henson" the one rack is shown loaded and ready for the curing barn. The peripheral confinements of the rack (sides) are horizontal. The leaves extend downward vertically. The next photo, captioned "Interior of Barn" shows the same positioning of the rack (horizontal) and leaves (vertical) as they are mounted in the curing barn. The diagram also shows this positioning in the barn along with a drawing of the forced air flow that is described in the claim.

The *News and Observer* diagram entitled "Experimental Model of Bulk Curing Chamber" shows the fan forcing air through a zone below the chamber. The air is channeled through an opening in the bottom of the chamber and travels vertically through the racks in the curing barn.

At this point, reference must be made to prior art to show the obviousness of the rest of this step. In Dr. Wightman W. Garner's book "The Production of Tobacco," the chapter "Curing the Leaf," (chapter 9) contains a section on flue-curing. Dr. Garner calls the first time period the "yellowing" period and in the early stages the heat is to be at

the compact bulk bundle intermediate the ends of said leaves,

"4. supporting a plurality of said compact bulk bundles within a confined zone solely by the peripheral confinements thereof with the latter disposed generally horizontally and the flat surfaces of the leaves disposed generally vertically at positions such that a flow of forced air within said confined zone will pass only between the flat surfaces of the leaves within the peripheral confinements thereof,

"5. establishing a substantially continuous flow of forced air vertically between the flat surfaces of the leaves of said plurality of compact bulk bundles within the peripheral confinements thereof while said plurality of bulk bundles are supported within said confined zone for a first time period at a temperature less than 110°F while controlling the relative humidity of the air sufficient to maintain a relatively high moisture content level in the leaves so that substantially all of the chlorophyle in the tobacco leaves is oxidized unmasking the yellow pigments present in the leaves,

90°–100° while a high relative humidity is maintained.

Note that the *News and Observer* diagram shows a damper means to control the humidity.

Garner also describes a second time period in his analysis of flue-curing which he calls "fixing the color" or "drying the leaf web." He describes this stage as increasing the temperature gradually (4° or 5° per hour) up to 110°–112°. The temperature is then held at that point until the tips of the leaf are dry and then the temperature is increased to 140°. Garner describes the process further stating that the temperature should be held at 140° until the leaf is very nearly dry "which means that there should be no further change in color." In all, this stage lasts for 30–36 hours and the moisture content of the leaf is reduced. He also talks of the ventilators being partially opened which accounts for the forced flow of air. (Garner p. 175)

The third time period that Garner describes is substantially the same process as described here. In his third time period, which he calls "the 'killing out' or drying the leaf midribs," the temperature is gradually increased (about 5° per hour) until it gets about 170°–180°F. The relative humidity here drops to about 10° It is at this stage that complete drying occurs.

Garner does not treat this stage as a "step" in the curing process of flue-cured tobacco. He does, however, in his chapter on "Grading and Marketing" (chapter 10), say that after the leaves are cured

"6. substantially continuously maintaining a forced flow of air while maintaining said support of the plurality of bulk bundles within said confined zone for a second time period at a temperature which is gradually increased and held at an intermediate elevated level while controlling the relative humidity of the air sufficient to initially arrest the chemical action taking place at the end of the first time period and to dehydrate the leaves to an intermediate lower moisture content level at the end of the second time period,

"7. substantially continuously maintaining a forced flow of air while maintaining said support of the plurality of the bulk bundles within said confined zone for a third time period at a temperature which is gradually increased and held at an upper elevated level while controlling the relative humidity of the air sufficient to bring the leaves to a crisp and fragile condition at the end of the third time period and,

"8. substantially continuously maintaining a forced flow of air while maintaining said support of the plurality of bulk bundles within said confined zone for a fourth time period at a reduced tempera-

that moisture must be restored in them so that they can be handled without breaking (p. 188).

ture level while controlling the relative humidity of the air sufficient to provide the leaves with a final moisture content permitting them to be handled without substantial breakage."

---

From this line-by-line analysis of the claims of the Method Patent, it is clear that the patent is invalid under 35 U.S.C., section 103. The first four claims were covered completely in the *News and Observer* article and the last four claims were covered in Dr. Garner's book written in 1951, and must be considered part of the prior art. It should be noted that although Dr. Garner has given specific times and temperatures, he says that this may differ when the variable factors of geography, soil makeup, climate, outside temperature, and skill of the operator, are taken into account. Dr. Hassler, however, in his own works,[52] said that as far as the temperature-time relationships were concerned, there was no significant difference between conventional and bulk curing. It should be noted that the plaintiffs contend that in bulk-curing there is a longer yellowing time. This, however, was disclosed in the *News and Observer* article.

The plaintiffs also rely heavily on the idea that it was common knowledge in the conventional-curing art that piling tobacco leaves together would ruin them, and that crowding them together in the barn would detrimentally affect their cure. This fact is evidenced by the testimony of two witnesses [53] and also indicated in Garner's work.[54] The trouble with this argument is that, although the

bulk-curing process as such was not accepted by the tobacco farmers, it was in fact revealed and could have been used. The *News and Observer* article pictorially describes the process step-by-step. In addition, the text of the article includes such statements relating to the similarity of bulk and conventional curing as:

(1) "A special barn is required to bulk-cure tobacco. However, the leaf is prepared for market the same way as conventionally cured tobacco."

(2) "Laboratory tests show there are no significant chemical differences in the bulk-cured and conventionally-cured tobacco."

Reference is also made to the labor-saving element of the process which made it financially attractive.

## WERE THE INVENTIONS IN QUESTION IN PUBLIC USE PRIOR TO JUNE 13, 1959, SO AS TO INVALIDATE THEM UNDER 35 U.S.C., SECTION 102(b)?

Public use has been defined as "the practical employment in public of a complete or operative invention." [55] If public use is found, the patents which have been granted shall be invalidated,[56] and it shall be a question of fact in light of all the evidence as to whether there has been a public use.[57] An analysis of the

---

52. See D.Ex. 23, 24.

53. The two witnesses are Mr. Lewis (P. Ex. 71 at p. 12) and Mr. Wilson (Trial Record, p. 537).

54. D.Ex. 9. p. 157.

55. Deller's. Walker on Patents, section 65, at p. 315.

56. United States Chemical Corp. v. Plastic Glass Corp., 243 F.2d 892 (3 Cir., 1957).

57. Cataphote Corp. v. DeSoto Chemical Coatings, Inc., 356 F.2d 24 (9 Cir., 1966).

facts in this case gives every indication that there has been a public use within the meaning of 35 U.S.C., section 102(b). This conclusion is based on the activities that surrounded the Oxford Station tests of 1958 which were those tests described in the *News and Observer* article. Although it is not stated exactly how many people were exposed to the tests there, there was no element of secrecy surrounding the tests. This is evidenced by the fact that, not only was this a public facility (part of North Carolina State College), but also that the material for the article by Tom Byrd in the *News and Observer* which disclosed the fundamental ideas being tested was freely given.

The plaintiffs contend that there was no public use within the meaning of 35 U.S.C., section 102(b) because they contend that Dr. Hassler was still in a stage of experimentation in 1958.[57a] In this contention, the plaintiffs rely on Elizabeth v. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 (1877). In that case, the plaintiff claimed infringement on a patent for paving streets. He had put down a paving on a road in Boston and the defendant contended that the public's use for six years prior to the application for the patent was a public use under the statute so as to invalidate the patent. The court, however, ruled for the plaintiff and upheld the patent. It said that where there has been good faith testing by the inventor to enable him to ascertain whether it will meet the purpose intended, there is not a public use within the meaning of the statute. It should be noted here that this case may be more the exception than the rule since the invention of road pavement involves, in itself, the need for public use as the only practical way to test the value of the invention.

Closer to the facts of this case is the recent case of Koehring Co. v. National Automatic Tool Co., Inc., 362 F.2d 100 (7 Cir., 1966), on which, incidentally, both parties here rely. That case in-

volved the validity of a small component of a plastic injection molding machine. The defendant contended that the plaintiffs' patent was invalid under the public use portion of section 102(b). The plaintiffs contended that their activities over the one-year period prior to the date of patent application were experimentation. The evidence showed that the prototype of the invention was completed and showroom tested before the critical date. Potential customers were present and there was no requirement of secrecy. Also, before the critical date, the production manager told the vice-president that the thing was "satisfactory as prototyped." The court concluded that the patent was invalidated by a prior use. In reaching this decision, the Seventh Circuit analyzed the policy considerations that must be made in these types of cases as follows:

"A reasonable period of experimentation wherein the inventor may perfect what he has conceived has long been acknowledged as an exception to the requirement of seasonable disclosure. But this exception must be recognized as such; it must be so limited as not to interfere with the effectuation of the policy underlying the general rule of early disclosure. An inventor may not be permitted to use a period of experimentation as a competitive tool. The use [of an invention] ceases to be experimental when the motivation of the inventor is to exploit the invention and gain a competitive advantage over others."

The same analysis given to *Koehring* may well be applied to our case. In the first place, the invention was essentially completed before the critical date. The plaintiffs submitted in their Brief After Trial (pp. 101–102) that the rack and method used during the 1958 experiments were essentially the same that was ultimately patented.[58]

In Koehring, the court noted that further testing of an invention may be both

---

57a. Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530 (2 Cir., 1955).

58. This was also brought out in the testimony of Dr. Hassler, Trial Record, pp. 141–143.

contemplated and desirable. But where the testing was open to the public in the showroom and to potential customers in connection with sales promotions, the inventor must carry the burden of showing that the use was part of a bona-fide program of experimentation. On this point, a parallel can be drawn between *Koehring* and our case in that the 1958 Oxford Station tests were open to the public. Furthermore, as Tom Byrd stated in his article in the *News and Observer,* "Results [of the 1958 tests] were so promising that private manufacturers have now been encouraged to consider the development of commercial equipment and to aid in farm-scale testing." It is true that Dr. Hassler did not obtain the obligation of a company to undertake the risk of this farm-scale testing until late 1959 when Allegheny stepped in. From the newspaper article and the very minimal, if any, further tests made in 1959, it is also evident that commercial acceptance of this process and rack was Dr. Hassler's prime concern, at least as early as 1958.[59] Dr. Hassler did state that what he had in 1958 was essentially what was patented but that he wanted to make further assurance that his specifications were correct. As *Koehring* said (at p. 104) however:

"Again the desirability of such testing is not disputed. But an invention or potential patentee may not enjoy the best of two possible worlds."

If the plaintiffs are to succeed on their contention that the patent should not be invalidated because Dr. Hassler was in a period of experimentation before the critical date (June 13, 1959), plaintiffs must prove this by clear and convincing evidence.[60] On the facts presented, plaintiffs have not carried this burden. The inventions were completed as of 1958

and all that was done further is experimentation with three tiers of racks in the barn and minor adjustments in the temperature range.[61] The plaintiffs, in fact, have admitted that the rack and method actually used in 1958 are the same as those patented. The only real evidence pointing toward experimentation is Dr. Hassler's statement that the further tests gave him more assurance.

In discussing a situation similar to this one, Judged Learned Hand said:

"The true situation appears to have been that the invention was not in the experimental stage, if by that is meant that the inventor was testing it with an eye to perfecting it. His work was done; * * * At most all that remained was to see whether it would work under service conditions."[61a]

Judge Hand cited the *Elizabeth* case and approved the idea that an experimentation period is acceptable not only where the inventor is "trying to reduce the invention to a stable form," but also where he needs time to determine "whether his invention is of enough value to justify an application for a patent." Judge Hand noted, however, that this added privilege is not unlimited and in fact some limitation "is clearly necessary if the privilege of experimenting is not to be abused."[62]

It may be noted that this case involved the sale of a substitute oil which the patentee claimed was still in the experimental stage. "Use" and "sale" are two different things under section 102(b), although in *Aerovox* the sale was considered a use. It is clear from the other law, however, that there does not have to be a sale to be a use under the statute.[63] Thus, it seems as if the same principles would apply where there has been a public use with a sale as where there is a

59. See Facts here pp. 7. 8; Plaintiffs' Proposed Findings of Fact. p. 18; and D.Ex. 23. at page 55B.

60. Smith & Griggs Manufacturing Co. v. Sprague. 123 U.S. 249, 264. 8 S.Ct. 122. 31 L.Ed. 141 (1887).

61. See Trial Record, pp. 142–143.

61a. Aerovox Corp. v. Polymet Manufacturing Corp.. 67 F.2d 860, 862 (2 Cir., 1933).

62. Id. at p. 862.

63. Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755 (1881).

public use without a sale. In the final analysis, based on both law and fact, therefore, we must determine that Dr. Hassler had put his method and rack in public use within the meaning of the statute and has not carried the burden of his contention of experimentation necessary to overcome the policy of early disclosure.

WERE THE INVENTIONS IN QUESTION ON SALE IN THIS COUNTRY MORE THAN ONE YEAR PRIOR TO THE DATE OF THE APPLICATION FOR PATENT IN THE UNITED STATES AS TO INVALIDATE THE PATENTS UNDER 35 U.S.C., SECTION 102(b)?

Although it is clear that much of the tobacco that was cured before June 13, 1959, was sold, there is no evidence that the process or rack was sold before this date. Thus, the question is whether the sale of a product of a process or apparatus is considered a "sale" within the meaning of the statute. (It should be noted at this point that the cases which have ruled on this issue refer to whether the sale of a product of a process is a "public use.") It has generally been held that if the product of a process was sold more than one year before the patent application for the process, the sale is a public use if the product sold discloses the process.[64] Based on the similarities in the end product of bulk and conventional curing, it does not seem as if the product of bulk curing would reveal the process. Thus on this point it does not appear that the patent is invalidated. There is further authority, however, that holds that such a sale is a public use even if the product does not reveal the process.[65] In U. S. Chemical Corporation v. Plastic Glass Corp., 243 F.2d 892 (3 Cir., 1957), the patentee who had made sales of the products of his process contended that these were experimental to determine "production controls." The court held that this was a public use under section 102(b) and said that, "Where, as here a patentee has used the process of a patent to create a product which has been sold on the market more than one year prior to the patent application, such use of the process and sales constitutes 'prior use' within the meaning of Section 102(b), 35 U.S.C."

■ Although the *U. S. Chemical Corporation* case may be authority for saying that there was a public use by the sales here, it seems as if a rule of reason should be applied and hold for the plaintiffs on this particular point. If the tobacco were not sold, there would be a waste. Furthermore, it must be realized that it was not the tobacco in its cured state that the plaintiffs are trying to protect. It is the method and rack for producing such cured tobacco that is their primary concern.

■ Since issues four (4) and five (5) have been previously considered in our discussion of the other points, we deem it unnecessary to extend this opinion. We do not hold, however, that Dr. Hassler's connection with North Carolina State College (now North Carolina State University) constitutes a dedication to the public use merely by reason of his employment.

Counsel for defendant will prepare and present, after endorsement by counsel for plaintiffs, an appropriate order in accordance with this opinion.

64. Soffron v. S. W. Lovell & Co.. 246 F.2d 769 (1 Cir., 1957); Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516 (2 Cir., 1946), cert. denied, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946)..

65. Tool Research and Engineering Corp. v. Honcor Corp., 367 F.2d 449 (9 Cir., 1966),; U. S. Chemical Corp. v. Plastic Glass Corp.. 243 F.2d 892 (3 Cir., 1957).